# EXHIBIT A

**EXHIBIT A**

FILED
18 OCT 15 PM 4:07

KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE NUMBER: 18-2-25910-0 SEA

1
2
3
4
5
6

**IN THE KING COUNTY SUPERIOR COURT FOR THE STATE OF WASHINGTON**

7

**SEATTLE COURTHOUSE**

8

9  **ABDIWALI MUSSE,**

10                              Plaintiff,          **CASE NO.**

11  v.

12
13  **WILLIAM HAYES, Director of King**          **PLAINTIFF'S COMPLAINT FOR**
    **County Department of Adult and**           **PERSONAL INJURIES AND DAMAGES**
14  **Juvenile Detention, in his individual and**
    **official capacity, J. DOES ONE**
15  **THROUGH FIVE, in their individual**
    **and official capacity, and KING**
16  **COUNTY, a county of the State of**
    **Washington,**
17

18                              Defendants.

19

20

21
        Plaintiff, ABDIWALI MUSSE ("Musse"), by and through his attorney, JAY H.
22
23  KRULEWITCH, hereby states and alleges as follows:

24                          **I. JURISDICTION AND VENUE**

25      1.1     This Court has concurrent jurisdiction over Plaintiff's federal civil rights claims
26
    under Title 42 United States Code § 1983.
27

28      1.2     This Court has jurisdiction over Plaintiff's state law claims and over defendants as

    to such claims.

**COMPLAINT FOR DAMAGES-1**

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

1      1.3     The acts and omissions complained of herein occurred in King County,

2   Washington, and the Defendants are residents and citizens of the state of Washington.

3      1.4     Plaintiff is a resident and citizen of the state of Washington.

4
5      1.5     Venue is predicated upon the fact that the acts complained of occurred in King

6   County, Washington.

7                                    **II. PARTIES**

8      2.1     Plaintiff Abdiwali Musse, a single person, at all times material to this cause of

9
10  action, was a resident of Seattle, in King County, Washington.

11     2.2     William Hayes, at all times material to this cause of action, was the Director of

12  the King County Department of Adult and Juvenile Detention ("King County Jail") and

13
14  responsible for: polices and procedures and implementation of policies and procedures with the

15  King County Jail.     At all times material to this cause of action, Director Hayes was acting

16  within the course and scope of his employment with King County.

17     2.3     J. Does One through Five are, at this time, unknown correctional and/or

18
19  classification officers and/or employees of the King County Jail engaged in pre-booking,

20  booking, classification tasks, and establishing and/or assigning a disciplinary history risk code for

21  all incoming inmates and for implementing King County Jail Policy regarding the segregation,

22
23  classification, and/or housing of incoming inmates at the King County Jail, including Mr.

24  Anderson and Mr. Musse, as well as unidentified correctional officers, who were duty officers

25  who were assigned to the Ninth Floor South Wing before, during, and after the incident.

26  Presently, Plaintiff is seeking the identity of J. Does One through Five, who together, in part, or

27
28  as part of their assigned duties, failed to do what they were supposed to do, including, but not

limited to: 1) computing/calculating/figuring the proper disciplinary history risk code for Carl

**COMPLAINT FOR DAMAGES-2**

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

Alan Anderson, 2) keeping Carl Alan Anderson segregated from non-violent first time arrestees/detainees, such as the Plaintiff, and/or 3) failing to take into account Carl Alan Anderson's prior custodial assault history and/or custodial history from prior bookings while at the King County Jail, including his prior disciplinary history and/or prior disciplinary history risk code while at the King County Jail. At all times material to this cause of action, J. Does One through Five were acting in the course and scope of their employment.

2.4 Defendant King County is a lawful political subdivision or entity in the State of Washington. The King County Department of Adult and Juvenile Detention ("King County Jail") is a correctional agency or department under the management and control of King County. At all times material to this cause of action, King County operated the King County Correctional Facility located at 500 Fifth Avenue, in Seattle, WA, in King County, Washington.

### III. FACTUAL BACKGROUND

3.1 In 1998, well before the incident in question, the King County Jail had entered in a private settlement agreement in the case of *Hammer, et al. v. King County, et al.*, United States District Court for the Western District of Washington No. C89-521R, in which the Plaintiffs and Defendant King County defendants agreed to the dismissal of this lawsuit. The private settlement agreement, reached between the parties, among other things, required the King County Jail to apply specific criteria to the classification, segregation, and housing of dangerous and/or violent persons being detained in the King County Jail. This private settlement agreement was entered into between the ACLU, several named Plaintiffs, and Defendant King County. Paragraph 3.2.1 of this private settlement agreement, which King County had voluntarily entered into, required the King County to as follows:

**COMPLAINT FOR DAMAGES**-3

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

53430032

King County will maintain a procedure to identify and integrate within records systems inmates with documented violent, assaultive or ongoing aggressive behavior in KCCF. As part of implementation of this procedure, King County will develop a "Disciplinary History Risk Code" to identify inmates with documented histories of such behavior. The Disciplinary History Risk Code will be entered in the KCCF information management system. The Disciplinary History Risk Code will be read by a corrections officer during the intake process for each incoming inmate. When a positive notation is read in the inmate's Disciplinary History Risk Code, the corrections officer will contact a designated classification specialist for review and selection of an appropriate initial housing assignment consistent with the security requirements of the inmate in question.

***See Exhibit One,*** a true and correct copy of the private settlement agreement in the Hammer Lawsuit.

3.2     On the evening of October 31, 2015, Abdiwali Musse was arrested by a police officer for a non-violent misdemeanor traffic offense and was transported to the King County Department of Adult and Juvenile Detention Facility ("King County Jail") in Downtown Seattle. Mr. Musse had never been arrested before.  After being processed into the King County Jail, Mr. Musse was transported up to a dormitory on the Ninth Floor of the King County Jail where he was housed with other inmates.

3.3     Also, placed into the very same dormitory as Mr. Musse was a person by the name of Carl Alan Anderson.  Mr. Anderson was someone whom the King County Jail was familiar with as he had been booked into the King County Jail on multiple occasions before the date of this incident.  By this date, Mr. Anderson was a known violent offender, with a long list of arrests and/or convictions for violent crimes.  He had been arrested for numerous violent felony and/or misdemeanor offense, including, but not limited to Robbery in the First Degree, Attempted Robbery in the First Degree, Assault in the Third Degree, Failure to Register as a Sex Offender, Rape of a Child in the First Degree, and Custodial Assault.  Just prior to this incident, Mr. Anderson had been arrested for a misdemeanor assault charge.  In addition, on the evening in

**COMPLAINT FOR DAMAGES**-4

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

53430032

1  question, Mr. Anderson was acting in a very bizarre fashion.  He was suffering an acute mental

2  health episode prior to the incident in question.

3       3.4      On November 1, 2015, at approximately 3:00 a.m., in the early morning hours of

4
   November 1, 2015, while incarcerated in the King County Jail in a dormitory on the Ninth Floor
5
6  of the King County Jail with other inmates, Abdiwali Musse was violently attacked by Carl Alan

7  Anderson, a known dangerous an unstable inmate.  Mr. Musse did nothing to provoke this attack.

8  At the time of the attack, he was sleeping on a bed in his dormitory to which he was assigned by
9
   J. Does One through Five ("Defendants Doe").  He was lying down on the bed, face up, and was
10
11 in a deep sleep.  He was neither bothering anyone nor causing any kind of commotion or

12 disturbance.  Mr. Musse was suddenly woken out of a sound sleep to being brutally attacked by
13
   Mr. Anderson, who was violently punching Mr. Musse in the face and around his eyes.  At first,
14
15 Mr. Musse was in shock that Mr. Anderson was hitting him at all.  Mr. Musse had no prior

16 altercation or disagreement with Mr. Anderson.  Then Mr. Musse did the best he could to defend

17 himself from Mr. Anderson's blows.  This was a completely unprovoked attack upon Mr.
18
   Musse's person.
19
20      3.5      On the day of the incident, Mr. Anderson was suffering an acute mental health

21 episode, was acting in a delusional and bizarre fashion, and was making threatening statements to

22 other inmates in the dormitory.  He claimed that demons were telling him to hit someone.  The
23
24 King County Jail had dealt with Carl Anderson on a number of previous occasions.  Defendants

25 Doe, as well as King County knew or should have known that Carl Anderson, a person with a

26 longstanding history of violent criminal convictions, including felony and misdemeanor
27
   convictions, should have had a very different disciplinary history risk code that Mr. Musse.
28

**COMPLAINT FOR DAMAGES-5**

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

3.6     On the day of the incident, the dedicated duty officer and/or other correctional officers assigned to Nine South of the King County Jail knew or should have known that Mr. Anderson was threatening other inmates and/or behaving in a bizarre manner.   This dedicated duty officer and/or other correctional officers assigned to Nine South failed to take appropriate action to respond to Mr. Anderson's intimidating, threatening and/or bizarre behavior, failed to summon additional officers to assist or otherwise intervene to prevent Mr. Anderson from intimidating, threatening, and/or attacking other inmates including Plaintiff Musse.

3.7     The Defendants knew or should have known, since the 1998 private settlement agreement (discussed above), as well as since the earlier court orders and/or consent decrees entered in 1991 in *Hammer v. King County,* United States District Court for the Western District of Washington, Case No. C89-521R, and the litigation which led to the 1991 orders, of the dangers involved in housing inmates with violent histories in correctional settings with non-violent arrestees.  Defendants knew or should have known of the need to segregate offenders with known histories of violence in correctional settings, from other, more vulnerable offenders, especially those who had never been jailed before, such as Plaintiff Musse.

3.8     Defendants Doe and King County knew or should have known that it was extremely dangerous to place a longtime violent felony offender, with a known propensity for violence, someone with a history of custodial assault, who was also suffering a mental health episode at the time of the incident, in a dormitory with Wali Musse, a non-violent pre-trial detainee, someone with no prior record of arrests or convictions and absolutely no history of violent offenses.

3.9     By their wrongful actions or omissions, Defendants Doe and King County knew or should have known that Mr. Anderson should have been housed and/or incarcerated in a

**COMPLAINT FOR DAMAGES-6**

Jay H. Krulewitch
2611 NE 113ᵗʰ St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

different dormitory, cell, or segregated cell, than Mr. Musse. Their wrongful actions or omissions resulted in a failure to take proper precautions to protect the Plaintiff, a pre-trial detainee with no prior criminal history and/or history of arrests, by putting Mr. Musse in the same dormitory as Mr. Anderson on the day of the incident in question.

3.10    By their wrongful actions or omissions, Defendants Doe and King County subjected Mr. Musse to unnecessary violence and terrible physical injuries and other damages which he suffered as a result of the above-described incident.

3.11    By their wrongful actions or omissions, Defendants Doe and King County displayed a callous disregard and/or reckless disregard for the constitutional rights of Mr. Musse in failing to adhere to or follow the Hammer private settlement agreement, and/or by failing to properly establish the disciplinary history risk code for Mr. Anderson, computing or establishing the disciplinary history risk code assigned to Mr. Anderson and to Mr. Musse, and placing Mr. Musse and Mr. Anderson into the same dormitory.

3.12    Defendant Director Hayes is likewise liable for the violation of Mr. Musse's constitutional and civil rights and for failing to train his staff and/or correctional officers as to the duties and responsibilities imposed by the Hammer Private Settlement Agreement, specifically, as it relates to computing a disciplinary history risk code for each incoming inmate and for properly selecting an appropriate dormitory, cell, or segregated cell or location to place persons who have a positive disciplinary history risk code. In addition, Defendant Director Hayes is liable for failing to adequately monitor King County Jail staff compliance with the obligations to check inmate histories and appropriately segregate or otherwise house inmates known, violent histories, as required by the Hammer Private Settlement Agreement.

**COMPLAINT FOR DAMAGES-7**

53430032

3.13    Plaintiff Musse is a member of the class of persons to be protected and/or a third party beneficiary of the Hammer Private Settlement Agreement.

3.14    Defendants' acts and omissions, as alleged above, proximately caused Plaintiff Musse to suffer a variety of serious physical injuries including a fractured orbital socket, injuries to his face, injuries to his mouth and his teeth, including but not limited to problems with his vision, including blurry vision, as well facial pain, headaches, along with pain and suffering, mental anguish, emotional distress, shame, humiliation, loss of enjoyment of life, loss of self-esteem, lost wages, and other related damages.

## IV.   FIRST CAUSE OF ACTION: UNCONSTITUTIONAL VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. SECTION 1983

4.1    Plaintiff repleads the allegations contained in paragraphs 1.1 through 3.14 of this complaint, and incorporates the same by reference as if fully set forth herein.

4.2    Defendant Director Hayes, King County, J. Does One through Five ("Defendants") displayed callous disregard, reckless disregard, and/or deliberate indifference to Plaintiff's constitutional rights, including his right to personal safety and bodily integrity, and to be free from being placed in a dangerous situation with respect to the dormitory, classification, or housing decision being made by Defendants.  Defendants ignored a known danger presented by inmate Carl Alan Anderson to Plaintiff which their actions or omissions placed him in.

4.3    As a result, Defendants violated Plaintiff's constitutional rights under the Fourth, Eight, and/or Fourteenth Amendments to the U.S. Constitution, which caused Plaintiff to suffer severe physical injuries, including a fracture of his orbital socket to his eye, and other

**COMPLAINT FOR DAMAGES-8**

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

53430032

1    injuries and damages as well.  Defendants are thereby liable under 42 U.S.C. Section 1983 for

2    all compensatory damages.

3
         4.4.    In addition, Defendant Director Hayes and Defendants Doe are also liable for
4
5    punitive damages under 42 U.S.C. Section 1983 for punitive damages for their actions and

6    omissions which were in callous or reckless disregard and/or in deliberate indifference to

7    Plaintiff's constitutional and civil rights.
8
         **V.   SECOND CAUSE OF ACTION: MUNICIPAL LIABILITY FOR**
9            **UNCONSTITUTIONAL VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C.**
10                           **SECTION 1983**

11       5.1    Plaintiff repleads the allegations contained in paragraphs 1.1 through 4.4 of this
12
13   complaint, and incorporates the same by reference as if fully set forth herein.

14       5.2    Defendant King County is liable to Plaintiff for violation of Plaintiff's

15   constitutional and civil rights for failure to train and/or supervise its correctional officers

16
     regarding establishing the proper disciplinary risk code for each incoming inmate, specifically,
17
18   Carl Anderson and/or for failing to train and/or supervise its correctional officers in the proper

19   implementation of the requirements of the Hammer Private Settlement Agreement, specifically

20   with regard to Section 3 dealing with Classification.  In addition, King County is also liable to

21
     Plaintiff for violation of Plaintiff's constitutional and civil rights for an unconstitutional policy,
22
23   custom, usage, and or final decision which was made by Director Hayes as the final

24   policymaking authority or decision-maker for the King County Jail.

25
         **VI.  THIRD CAUSE OF ACTION: STATE TORT CLAIM OF NEGLIGENCE**
26
27       6.1    Plaintiff repleads the allegations contained in paragraphs 1.1 through 5.2 of this

28   complaint, and incorporates the same by reference as if fully set forth herein.

**COMPLAINT FOR DAMAGES-9**

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

6.2     Defendant Director Hayes and J. Does one through five ("Defendants Doe), by their actions or omissions, were negligent for:

1) failing to take all reasonable steps to protect the safety and bodily integrity of the Plaintiff, and/or

2) failing to assign Plaintiff to a dormitory where he would be free from dangerous persons and/or a dangerous situation, and/or

3) failing to properly establish a disciplinary history risk code for Carl Anderson which would have prevented him from being housed or assigned to the same dormitory as the Plaintiff; and/or

4) failing to properly evaluate Carl Alan Anderson for a different dormitory, cell, or segregated cell, given the fact that he had a different disciplinary history risk code than the Plaintiff, that he was suffering from a mental health episode and acting in bizarre fashion and should have been segregated from the Plaintiff, a non-violent pre-trial detainee with no prior criminal history.

6.3     Defendant King County is liable for the actions of Defendant Director Hayes and/or Defendants Doe under respondeat superior.

6.4     As a result of Defendants negligent conduct, Plaintiff suffered severe physical injuries, including a fracture of his orbital socket to his eye, and other injuries and damages as well.

## VII.   FOURTH CAUSE OF ACTION: NEGLIGENT IMPLEMENTATION OF THE HAMMER PRIVATE SETTLEMENT AGREEMENT

7.1     Plaintiff repleads the allegations contained in paragraphs 1.1 through 6.4 of this complaint, and incorporates the same by reference as if fully set forth herein.

COMPLAINT FOR DAMAGES-10

Jay H. Krulewitch
2611 NE 113th St. Suite 300
Seattle, WA 98125
(206) 233-0828
jay@krulewitchlaw.com

53430032

7.2    Defendant Director Hayes and Defendant Does had a duty to reasonably and diligently implement the Hammer Private Settlement Agreement (referenced above). Defendant Director Hayes and Defendant Does breached that duty to the Plaintiff by failing to properly determine the disciplinary history risk code for Mr. Anderson and then by failing to place Mr. Anderson into a different dormitory, cell, or segregated cell, than the dormitory in which Plaintiff was selected for and placed into.

7.3    Defendant King County is liable for the actions of Defendant Director Hayes and/or Defendants Doe under respondeat superior.

7.4    As a result of Defendants' negligent conduct, Plaintiff suffered severe physical injuries, including a fracture of his orbital socket to his eye, and other injuries and damages as well.

## VIII.   BREACH OF CONTRACT FOR VIOLATION OF THE HAMMER PRIVATE SETTLEMENT AGREEMENT

8.1    Plaintiff repleads the allegations contained in paragraphs 1.1 through 7.4 of this complaint, and incorporates the same by reference as if fully set forth herein.

8.2    Plaintiff Musse is a third-party beneficiary of the Hammer Private Settlement Agreement.

8.3    Defendants violated the Hammer Private Settlement Agreement by failing to properly determine the disciplinary history risk code for Mr. Anderson and then by failing to place Mr. Anderson into a different dormitory, cell, or segregated cell, than the dormitory in which Plaintiff was selected for and placed into.

8.4    Defendants are liable for damages caused to Plaintiff Musse for breaching their duties and/or responsibilities under the Hammer Private Settlement Agreement.

**COMPLAINT FOR DAMAGES-11**

8.5     As a result of Defendant's breach of contract, of the Hammer Private Settlement,  Plaintiff has suffered severe physical injuries, including a fracture of his orbital socket to his eye, and other injuries and damages as well.

## IX. LIMITED PHYSICIAN/PATIENT WAIVER

9.1     The plaintiff hereby waives the physician/patient privilege only to the extent required by RCW 5.60.060, as limited by the plaintiff's constitutional rights of privacy, contractual rights of privacy, and the ethical obligation of physicians and attorneys not to engage in ex parte contact between a treating physician and the patient's legal adversaries.

## X. PRAYER

WHEREFORE, Plaintiff prays for the following relief, jointly and severally, against the above-named defendant;

1. Full compensatory damages, including, but not limited to any and all past lost earnings as well as future lost earnings, disfigurement, medical expenses, loss of self-esteem, loss of enjoyment of life, shame, embarrassment, humiliation, pain and suffering and emotional distress, and other damages to be proven at the time of trial;

2. Punitive Damages as allowed by law under 42 U.S.C. Section 1983 against Director William Hayes and/or J. Does One through Five;

3. Reasonable Attorney's Fees and/or Statutory Attorney's Fees under 42 U.S.C. Section 1983 and 1988 where allowed under Washington Statute and/or case law;

4. Costs;

5. Prejudgment Interest;

6. And for such other and further relief to be proven at the time of trial and as the court deems just and equitable.

**COMPLAINT FOR DAMAGES**-12

53430032

Dated this 15th day of October, 2018.

1

2                                          JAY H. KRULEWITCH, ATTORNEY AT LAW

3                                          /s/ Jay H. Krulewitch
                                           Jay H. Krulewitch, WSBA #17612
4                                          Attorney for Plaintiff Abdiwali Musse

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR DAMAGES-13**

53430032

*Exhibit One*

53430032

SETTLEMENT AGREEMENT

BY AND BETWEEN

ACLU OF WASHINGTON, CALVIN HAMMER, EDWARD BOEKEL, MELTON
ATKINS, WILBORN KELLEY STEVENS

AND

KING COUNTY

53430032

# TABLE OF CONTENTS

Recitals .............................................................. Page 1

Section 1. Definitions ..................................................... Page 1

Section 2. Staffing ...................................................... Page 5

    2.1. Staffing Pattern ................................................ Page 5
    2.2. Control Positions ............................................... Page 7
    2.3. Inmate Transport ............................................... Page 8

Section 3. Classification ................................................. Page 10

    3.1. Pre-Classification .............................................. Page 10
    3.2. Inmate Movement ............................................. Page 12
    3.3. Reclassification ................................................ Page 12
    3.4. Kite System ................................................... Page 13

Section 4. Beds ......................................................... Page 13

    4.1. 72 Hour Limits ................................................ Page 13
    4.2. Capacities .................................................... Page 14
    4.3. Bed Limitations ............................................... Page 15
    4.4. South Dorm Pop. .............................................. Page 16

Section 5. G Dorm ...................................................... Page 17

Section 6. Medical Issues ............................................... Page 17

    6.1. NCCHC Accreditation .......................................... Page 17
    6.2. Quality Assurance ............................................. Page 18

Section 7. Modification .................................................. Page 20

Section 8. Other Matters ................................................ Page 21

53430032

# SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT is made this ___ day of _____, 1998, between the ACLU of Washington, Calvin Hammer, Edward Boekel, Melton Atkins, Wilborn Kelley Stevens (hereinafter "Hammer Plaintiffs") and King County, Washington (hereinafter "King County").

## WITNESSETH:

WHEREAS the parties to this Settlement Agreement wish to finally resolve the issues raised in *Hammer, et al. v. King County, et al.*, United States District Court for the Western District of Washington No. C89-521R (hereinafter "*Hammer* lawsuit") and dismiss that cause of action;

WHEREAS the Court in the *Hammer* lawsuit previously entered orders on February 26, 1990, October 12, 1991, and June 4, 1991 and retained jurisdiction in order to supervise the implementation of those orders; and

WHEREAS these orders provide for the termination of jurisdiction by the United States District Court; and

WHEREAS further supervision by the United States District Court is unnecessary;

NOW THEREFORE, in consideration of the mutual promises made hereinafter and other good and valuable consideration the receipt and adequacy of which is hereby acknowledged, THE PARTIES DO HEREBY AGREE as follows:

## SECTION 1. DEFINITIONS

The following definitions shall apply to the terms used in this Settlement Agreement:

SETTLEMENT AGREEMENT - 1

**1.1.** <u>King County Correctional Facility (KCCF)</u> means the facilities located on the 500 block of Fifth Avenue in Seattle, Washington. The KCCF does <u>not</u> include the work release facility on the twelfth floor of the King County Courthouse, the North Rehabilitation Facility, the Regional Justice Center Detention Facility or any other satellite facility, <u>except</u> with respect to transportation issues set forth in section 2.3. below.

**1.2.** <u>Tower</u> means the housing areas of floors 7, 8, 9, 10, and 11 of the KCCF. Tower, as defined, does <u>not</u> include the Intake, Transfer and Release (ITR) area of the KCCF.

**1.3.** <u>West Wing</u> means the housing areas on Floors 1, 2, 3, and 4 of the KCCF, including all 4th floor housing areas, whether located in the west wing of the KCCF, the north wing of the KCCF, or other portions of the KCCF on that same level.

**1.4.** <u>Population</u> for any area of the KCCF addressed in this Settlement Agreement shall be determined by reference to the King County Department of Adult Detention Daily Physical Population Count.

**1.5.** <u>Close Security Split Housing Area</u> means transition housing for inmates with behavior problems, either for pre- or post-administrative segregation.

**1.6.** <u>Continuous</u> means that a particular post is staffed at all times except in specified emergency situations. Continuously staffed posts are to be provided relief for routine activities such as breaks, meals, and use of the restroom. A continuously staffed post will not be provided relief during an emergency response by the officer assigned to that post. An officer assigned to a continuously assigned post may vacate the post without relief only to assist in another area of the facility during a code blue, code red, or

SETTLEMENT AGREEMENT - 2

code yellow emergency such as a fire, inmate fight, medical emergency, or escape attempt.

1.7.    <u>Dedicated</u> means that a post is staffed at all times except in extreme emergencies.  Dedicated posts are to be provided relief for routine activities such as breaks, meals, and use of the restroom.  An officer assigned to a dedicated post will not under normal circumstances respond to a code blue, code red, or code yellow emergency. An officer assigned to a dedicated post will leave that post without relief only upon order of the ranking correctional supervisor on duty when that supervisor has determined that the undesirability of vacating the post is outweighed by the extreme nature of the emergency situation.

1.8.    <u>Intermittent</u> means that a post will not be staffed at all times and may be vacated without relief for routine absences such as meals and breaks.  "Intermittent" includes posts commonly described as providing relief and escort duties in the King County Correctional Facility (KCCF); officers assigned to these posts may also assist in other operational activities designated by management, including, but not limited to, security checks, inmate counts, inmate feeding, and emergency response.

1.9.    <u>Document</u> means, without limiting its generality, correspondence, e-mail, telegrams, cables, teletype messages, mailgrams, reports, records, schedules, diaries, court dockets, court files and papers found therein, notes, summaries, memoranda, memoranda of telephone conversations, photographs, depictions, sketches, renderings, mechanical and electronic records of conversations or of statements or of telephone conversations, and all other printed, typewritten, written, recorded, or taped matter of any kind or description.

53430032

**1.10.**    Jail Health Services (JHS) means the Jail Health Services program administered by the Seattle-King County Department of Public Health pursuant to any agreement, whether written or oral, with the King County Department of Adult Detention. In the event that health care in the King County Jail is at some future date provided by any other agency, whether public or private, the term Jail Health Services shall be construed to apply to whatever agency or entity is responsible for the provision of health care to inmates in the King County Correctional Facility.

**1.11.**    National Commission on Correctional Health Care (NCCHC) is a non profit corporation which has developed standards and provides accreditation for medical care and health services in jails.  All references hereinafter to standards for health services in jails shall mean a reference to the 1996 NCCHC standards, a copy of which is attached to this Settlement Agreement and incorporated by this reference.  In the event that some organization is the successor to the National Commission on Correctional Health Care, just as the National Commission on Correctional Health Care is recognized as the successor of the American Medical Association with respect to the development of standards for health services in jails, then the term "NCCHC" shall be construed to apply to the successor organization.

**1.12.**    American Correctional Association ("ACA") is a private, non-profit organization that has developed national standards for all components of adult local detention facilities.  In the event that some organization is the successor to the ACA, then the term "ACA" shall be construed to apply to the successor organization.

## SECTION 2. STAFFING

2.1.    King County shall continue to maintain the following staffing pattern in

the KCCF:

Floors 1, 2, and 3:

| Post Coverage | Shift | | | Days/Week |
|---|---|---|---|---|
| | 1st | 2d | 3d | |
| 1st Floor Officer Intermittent | 1 | 1 | 1 | 7 |
| Floor 2/3 Officer 1 Dedicated | 1 | 1 | 1 | 7 |
| Floor 2/3 Officer 2 Continuous | 1 | 1 | 0 | 7 |
| Floor 2/3 Officer 3 Intermittent | 1 | 1 | 1 | 7 |

Fourth Floor:

| Post Coverage | Shift | | | Days/Week |
|---|---|---|---|---|
| | 1st | 2d | 3d | |
| North Unit Officer Dedicated | 1 | 1 | 1 | 7 |
| North Unit Activities Officer Intermittent | 1 | 1 | 0 | 7 |
| West Unit Officer Dedicated | 1 | 1 | 1 | 7 |
| West Unit Activities Officer Intermittent | 1 | 1 | 0 | 7 |
| 4th Floor Activities Officer Intermittent | 0 | 0 | 1 | 7 |

SETTLEMENT AGREEMENT - 5

53430032

Case 2:18-cv-01736-JCC   Document 1-2   Filed 12/03/18   Page 23 of 41

Tower:

| Floor | Post Coverage | Shift | | | Days/Week |
|-------|---------------|-------|---|---|-----------|
| | | 1st | 2d | 3d | |
| 7 | North Wing Officer Dedicated | 1 | 1 | 1 | 7 |
| | East Wing Officer Continuous* | 1 | 1 | 1 | 7 |
| | South Wing Officer Dedicated | 1 | 1 | 1 | 7 |
| | Infirmary Officer Continuous* | 1 | 1 | 1 | 7 |
| | Activities Officer Intermittent | 2 | 2 | 1** | 7 |

| Floor | Post Coverage | Shift | | | Days/Week |
|-------|---------------|-------|---|---|-----------|
| | | 1st | 2d | 3d | |
| 8 | North Wing Officer Continuous* | 1 | 1 | 1 | 7 |
| | East Wing Officer Continuous* | 1 | 1 | 1 | 7 |
| | South Wing Officer Dedicated | 1 | 1 | 1 | 7 |
| | Activities Officer Intermittent | 2 | 2 | 0 | 7 |
| 9 | North Wing Officer Continuous* | 1 | 1 | 1 | 7 |
| | East Wing Officer Continuous* | 1 | 1 | 1 | 7 |
| | South Wing Officer Dedicated | 1 | 1 | 1 | 7 |
| | Activities Officer Intermittent | 2 | 2 | 0 | 7 |
| 10 | North Wing Officer Continuous* | 1 | 1 | 1 | 7 |
| | East Wing Officer Continuous* | 1 | 1 | 1 | 7 |

SETTLEMENT AGREEMENT - 6

53430032

|  | | I | II | III | |
|---|---|---|---|---|---|
|  | South Wing Officer Dedicated | 1 | 1 | 1 | 7 |
|  | Activities Officer Intermittent | 2 | 2 | 0 | 7 |
| 11 | North Wing Officer Continuous* | 1 | 1 | 1 | 7 |
|  | East Wing Officer Continuous* | 1 | 1 | 1 | 7 |
|  | Activities Officer Intermittent | 2 | 2 | 0 | 7 |

\* Coverage of these posts will be in accordance with the definition contained in Paragraph 1.2 of "Continuous" posts on first and second shifts and will revert to "intermittent" coverage during third shift.

\*\* The incumbent of this position during the third shift shall be utilized as designated by the shift commander.

**2.2.**  Control Positions.  King County shall continue the operational functions currently performed by floor and central control officers, although those positions are not shown in the staffing pattern set forth in Paragraph 2.1. above.  It is within King County's discretion to amend the KCCF staffing plan from time to time as circumstances change. If King County reduces the number of control positions or the positions set forth in the staffing pattern in paragraph 2.1. above, it shall notify the *Hammer* Plaintiffs' counsel of the change, the reason for the change, and the effective date of the change.  Any review of such a decision to reduce the number of positions shall be limited to whether the reduction in positions will prevent King County from providing the post coverage indicated for those posts designated as "Dedicated" and "Continuous*", or in the case of control positions, whether the operational functions currently performed by floor and central control officers are continued.  This Settlement Agreement shall not be construed to prohibit King County from redeploying central and control posts; provided, the

53430032

operational functions currently performed by floor and central control officers are continued.

    **2.3.**    <u>Staffing for Inmate Transportation to Court Appearances</u>.

    **2.3.1.**  <u>Transportation to Courts of the State of Washington.</u>  King County shall transport all inmates who have "scheduled court appearances" to those appearances in courts of the State of Washington, including Superior and District Courts, but not municipal courts, in the following manner.  "Scheduled court appearances" means those court appearances for an inmate of which the Department of Adult Detention has been notified by 1 p.m., the day prior to the appearance or which occur on a regularly scheduled basis, such as omnibus, initial appearance, or arraignment calendars. "Scheduled court appearances" shall not include "add-ons" by judges or their staffs, schedule changes without the above specified notice, or unannounced departures from established court practice.  King County shall provide sufficient resources to transport inmates to scheduled court appearances; <u>provided</u>, King County's failure to transport an inmate to a "scheduled court appearance" due to delays, cancellations, or unexpected emergencies beyond its control shall not constitute a violation of this Settlement Agreement.  Nothing stated herein shall derogate from the authority, power, and jurisdiction of judges of the courts of the State of Washington.

    **2.3.2.**  <u>Transportation to Seattle Municipal Court.</u>  King County shall transport all inmates to all "scheduled court appearances", as defined above in Paragraph 2.3.1., for all Seattle Municipal Court appearances in courtrooms located in the KCCF or the Public Safety Building for daytime hearings so long as King County and the City of Seattle have an agreement that King County will provide transportation for such

SETTLEMENT AGREEMENT - 8

53430032

appearances; provided, the City of Seattle notifies the Department of Adult Detention by
4 p.m., the day prior to any scheduled court appearance in morning court or by 9 a.m., on
the day of the scheduled court appearance in afternoon court.  King County shall
transport all inmates to "scheduled court appearances" in Seattle Municipal Court night
court held in courtrooms located in the KCCF; provided, the City of Seattle provides
notification to the Department of Adult Detention by 1 p.m., on the scheduled day and so
long as King County has an agreement to provide such inmate transportation to night
court.

King County will immediately notify the *Hammer* Plaintiffs' counsel if King
County and the City of Seattle renew or terminate any agreement for transportation of
inmates to night court.  King County will allow the *Hammer* Plaintiffs' counsel an
opportunity for participation and comment regarding currently pending and future
negotiations between King County and the City of Seattle on any agreement for
transportation of inmates to night court.

2.3.3.  Staffing for Inmate Transportation for Medical Care.  King County
shall transport all inmates to medical care outside the KCCF pursuant to the following
terms.  The determination of an inmate's medical condition and the necessity for outside
medical care shall be made by jail medical staff.  In cases of medical emergency, as
determined by jail medical staff, the transport will receive the highest priority, including
priority over court transports, non-emergency medical appointment transports, and the
staffing of continuous and intermittent posts.  In cases of non-emergency medical care,
jail medical staff will schedule appointments for outside medical care for those inmates
whose medical condition, as determined by jail medical staff, requires outside medical

53430032

care while in custody.  Appointments for non-emergency medical appointments will be

scheduled as far in advance as possible consistent with the inmate's medical needs.  King

County shall provide sufficient resources to transport inmates to non-emergency medical

appointments scheduled by jail medical staff; provided, King County's failure to

transport an inmate to a non-emergency medical appointment due to delays,

cancellations, or unexpected emergencies beyond its control shall not constitute a

violation of this Settlement Agreement.

### SECTION 3.  CLASSIFICATION

**3.1.**    Pre-Classification System.

**3.1.1.**    Inmates Transferred From Prisons.  King County will ask that

Washington State Department of Corrections (DOC) facilities provide DAD with

information whether individuals transferred to the KCCF from DOC have a history of

violent institutional behavior.  King County shall consider the information received from

DOC in making its determination of where such an inmate shall be housed in the KCCF.

King County shall institute a policy to ensure that any inmate transferred to the

KCCF from a federal prison or out-of-state prison shall not be housed with the general

population of the KCCF until a classification specialist has made a determination that

housing such an inmate with the general population is appropriate.

**3.1.2.**    Pre-Classification Identification of Inmates with Records of
Violent, Assaultive or Ongoing Aggressive Behavior in KCCF.

King County will maintain a procedure to identify and integrate within records

systems inmates with documented violent, assaultive or ongoing aggressive behavior in

KCCF.  As part of implementation of this procedure, King County will develop a

53430032

"Disciplinary History Risk Code" to identify inmates with documented histories of such behavior. The Disciplinary History Risk Code will be entered in the KCCF information management system. The Disciplinary History Risk Code will be read by a corrections officer during the intake process for each incoming inmate. When a positive notation is read in the inmate's Disciplinary History Risk Code, the corrections officer will contact a designated classification specialist for review and selection of an appropriate initial housing assignment consistent with the security requirements of the inmate in question.

  **3.1.3.** <u>Disciplinary Hearings</u>. King County will maintain a procedure to prioritize disciplinary infractions to ensure that all serious infractions are heard within the time provided in the American Correctional Association (ACA) standards for local jail facilities. King County will make staffing available to ensure that disciplinary hearings are conducted and reported seven days per week. The *Hammer* Plaintiffs will raise no objection to efforts by King County to extend the permissible time frame for conducting disciplinary hearings to reflect that contained in the ACA standards.

  A designated classification specialist will review all serious infraction hearings to identify those inmates whose violent, assaultive or ongoing aggressive behavior in the KCCF warrants the assignment of a positive "Disciplinary History Risk Code." In addition, classification specialists who hear disciplinary infraction cases of lesser severity will forward to the designated classification specialist reports on those inmates whom they believe should be reviewed for consideration for the Disciplinary History Risk Code. King County will ensure that the Disciplinary History Risk Code will be entered into the KCCF information management system..

SETTLEMENT AGREEMENT - 11

**3.2.**   Inmate Movement

King County will maintain procedures to ensure that all forms (currently known as Form 571's), which are used for the movement of inmates by corrections officers without the intervention of classification specialists, will be reviewed by a Sergeant to ensure that movement of the inmate by the corrections officer is appropriate under the circumstances. All such forms will be referred to the Classification Section for review within one shift after the movement has taken place.

**3.3.**   Reclassification

King County will continue its policy of reclassification of inmates. Reclassification may occur for the following reasons:

Persons who show emerging medical or mental health problems

A change in charge status, including sentencing

Problematic behavior

Protective custody status change

Incompatibility with others

Keep separate considerations

Administrative segregation reviews

Disciplinary behavior

Review for work release

Review for home detention

Review for North Rehabilitation Facility

Review for inmate worker status

Review for program consideration

Needs of the institution

Information received from other criminal justice agencies

Information received from outside sources, i.e., lawyers, parents, friends, etc.

Inmate requests for reclassification

Upon assignment to a close security split housing area, an inmate will be provided with an explanation of the procedures for requesting reclassification and the appropriate circumstances in which reclassification will occur.

### 3.4. Kite System

King County will maintain the following procedures to ensure that inmate kites are received by the Classification Section of the KCCF in a timely manner: Classification kites will be readily identifiable by inmates and staff. A supply of classification kites will be made available on an ongoing basis in the KCCF housing areas. All filled out classification kites will be delivered directly to the classification specialist who is stationed on the floor on which the inmate is housed. King County will maintain receptacles for kites to be installed outside housing areas. Only jail staff will be authorized to pick up kites.

### SECTION 4. BEDS

### 4.1. 72 Hour Limitations:

**4.1.1.** King County will limit the housing of inmates on mattresses on the floor to no more than a single seventy-two (72) hour period.

**4.1.2.** King County will implement a system to monitor inmates assigned to mattresses on the floor, to ensure that any such inmate is assigned to a mattress on the

SETTLEMENT AGREEMENT - 13

floor for no more than a single seventy-two (72) hour period during each period of incarceration in the KCCF. This provision shall not apply to an inmate assigned to a mattress on the floor for medical or psychiatric reasons.

      **4.1.3.** No inmate shall be assigned to a mattress on the floor in medical or psychiatric housing areas except upon the approval or direction of medical or psychiatric staff.

      **4.1.4.** King County shall provide to the *Hammer* Plaintiffs' counsel copies of periodic cumulative reports generated by the system developed to monitor inmates assigned to mattresses on the floor pursuant to this section. Such periodic cumulative reports shall be generated at least once per month. King County shall grant access to the *Hammer* Plaintiffs' counsel upon request to information reflecting daily statistics regarding inmates assigned to mattresses on the floor.

    **4.2.**   <u>Capacity</u>

      **4.2.1.** King County shall not permit the population of the KCCF to exceed 1,697 for more than 24 hours. The population of the KCCF shall be measured by the number of persons housed in the KCCF exclusive of those persons in the Intake, Transfer and Release (ITR) area of the KCCF.

      **4.2.2.** King County shall not permit the population of the Tower portion of the KCCF to exceed 1,262 for more than 24 hours. The population of the Tower portion of the KCCF shall be measured by the number of persons housed in the Tower exclusive of those persons in the Intake, Transfer and Release area of the KCCF.

4.2.3.   King County shall not permit the population of the West Wing of the KCCF to exceed 435.  The population of the West Wing of the KCCF shall be measured by the number of persons housed in that area of the facility.

4.2.4.   King County shall not permit the population of the West area of the Fourth Floor of the West Wing of the KCCF to exceed 90.  The population of the West area of the Fourth Floor of the West Wing of the KCCF shall be measured by the number of persons housed in that area of the facility.

**4.3.**   Bed Limitations

4.3.1.   All bunks installed in the KCCF shall have no anchor points.

4.3.2.   King County shall not double cell inmates in those housing areas designated as pre-disciplinary segregation, disciplinary segregation or administrative segregation, or in close security split housing units.

4.3.3.   In the units used for inmates who are assigned to a particular housing area for special custody needs, inmates will not be assigned to a mattress on the floor or an upper bunk bed if medical or psychiatric staff disapprove.

4.3.4.   In those units where inmates under mental health observation are housed, the population shall not exceed the number of inmates equal to the number of beds in the unit as originally designed plus three additional inmates.  No inmates under mental health observation shall be housed in any area of the Tower containing upper bunks.

4.3.5.   All beds added to the original design of the KCCF shall be upper bunks installed over beds along the walls so as not to interfere with the lines of sight for correctional officers assigned to the south wing officer's stations or south wing core area.

SETTLEMENT AGREEMENT - 15

53430032

**4.3.6.**  King County shall not triple cell inmates in the North or East wings of the Tower.

**4.3.7.**  King County shall not place inmates on the floor of the day rooms in the North or East wings of the Tower, except that during unforeseen peaking of the female inmate population, such use of the day rooms as an area to assign female inmate beds or mattresses shall be permitted for no more than a single seventy-two hour period in any fourteen day period.

**4.3.8.**  King County shall maintain feeding slots in cell doors on the 11th floor of the KCCF so that all cell doors on that floor have feeding slots in them.

**4.4.**    South Dormitory Population

**4.4.1.**  King County shall limit the inmate population in each South Wing of the KCCF to no more than 160.  King County shall further make a good faith effort to comply with a limit of 20 inmates per dormitory unit in each South Wing.

**4.4.2.**  If the inmate population limit of 20 per dormitory unit in the South Wings is exceeded, the reason therefor shall be documented.  King County shall promptly provide any documentation to the *Hammer* Plaintiffs' counsel with respect to overcrowding in the South Wing dormitory units upon request.  The Director of the Department of Adult Detention shall promptly inform the *Hammer* Plaintiffs' counsel in the event of any unexpected emergency beyond King County's control which results in the population of any South Wing exceeding 160.  King County shall reduce the population in the affected South Wing to 160 or fewer within three (3) days.

**4.4.3.**  In the event that King County renovates or remodels a portion of the KCCF as described in paragraph 7.3. of this Settlement Agreement, King County may

request that the *Hammer* Plaintiffs' counsel meet and confer regarding the possibility of exceeding the limitations of this section for the time required to complete the renovation or remodel.

## SECTION 5.  G DORM RENOVATION AND PROGRAMS

Within 90 days of the execution of this Settlement Agreement, King County shall renovate the G dorm on the Fourth Floor of the West Wing of the KCCF for program space.  Within 90 days of the completion of this renovation, King County shall provide a minimum of four hours per day, five days per week of new programs in G dorm.  King County shall maintain A dorm, or a similar dorm in the West area of the Fourth Floor of the West Wing of the KCCF, as program space.

## SECTION 6.  MEDICAL ISSUES

6.1.   NCCHC Accreditation.

6.1.1.   King County shall maintain NCCHC accreditation and continue to meet all standards necessary to maintain NCCHC accreditation, including those standards designated as "essential" by the NCCHC and the following standards or their successors designated as "important" by the NCCHC:

    J-08:   Privacy of care

    J-11:   Grievance procedure

    J-23:   Staffing levels

    J-29:   Hospital care

    J-39:   Mental health evaluation

    J-41:   Assessment protocols

J-42:   Continuity of care

J-54:   Inmates with drug or alcohol problems

J-68:   Right to refuse treatment

6.1.2. As part of compliance with essential standards J-04 (Policies and Procedures), J-18 and J-19 (Training), and J-36 (Emergency Services), King County shall: (1) maintain a system for inmate access to emergency healthcare; 2) describe in writing the responsibility of healthcare staff for emergency assessment and care as it relates to triage and timely referral; and 3) maintain and appropriately update ongoing training programs for all healthcare providers regarding emergency assessment and care.

One function of any quality assurance committee established in accordance with Standard J-05 will be to identify and bring to the attention of the Health Authority (as defined in the NCCHC standards) appropriate training needs and/or deficiencies. It shall be the responsibility of the Health Authority to consider and, when appropriate, incorporate such recommendations into the Jail Health Services training plan.

6.1.3.  King County shall make available to the *Hammer* Plaintiffs' counsel upon request all technical assistance reports, recommendations and other documents to or from the NCCHC with respect to King County's compliance with NCCHC standards.

6.2.   Peer Review and Quality Assurance.

6.2.1.  Any and all peer review programs and quality assurance programs established in accordance with standard J-05, or its successor, shall involve the participation of regular faculty (as distinguished from clinical faculty) from the University of Washington in an appropriate healthcare field or a qualified healthcare professional not affiliated with the Seattle King County Department of Public Health. King County may

SETTLEMENT AGREEMENT - 18

53430032

comply with this requirement through the participation of any Jail Health Services or Seattle-King County Department of Public Health staff who are appointed to the regular faculty of the University of Washington schools of Medicine, Nursing or Dentistry; however, in the event that no such faculty are on staff with Jail Health Services or with the Seattle-King County Department of Public Health, then King County shall undertake its best efforts to solicit members of all quality assurance or peer review committees from the University of Washington or a qualified health care professional not affiliated with the Seattle King County Department of Public Health.

     **6.2.2.**   The quality assurance committee or committees established pursuant to Standard J-05 shall review and monitor the following categories of records:

a)     Outpatient care charts.

b)     Infirmary care charts.

c)     Charts of individuals referred to outside medical facilities.

d)     Dental care charts.

e)     Psychiatric care charts, including care by psychiatric evaluators and psychiatric nurses.

f)     Charts of patients with chronic conditions.

g)     Information contained in charts with respect to nursing care.

h)     Information contained in charts with respect to physician care.

i)     Information contained in charts with respect to 14 day health assessments.

The foregoing list of categories is neither exhaustive nor does it carry an obligation that King County review any particular kind, number or category of charts or information at any given time. The determination of which information and/or records to be reviewed and the

SETTLEMENT AGREEMENT - 19

scheduling of such review shall be left to the sole discretion of the relevant quality assurance committee or committees.

      **6.2.3.**   Policies and protocols shall be made available to the *Hammer* Plaintiffs' counsel upon request.  This obligation to provide policies and protocols includes all policies and procedures to be utilized by the Quality Assurance Committee and any peer review committees established pursuant to Standard J-05.  King County shall also provide to the *Hammer* Plaintiffs' counsel upon request copies of all training plans currently utilized, or to be utilized at any time hereafter.

      **6.2.4.**   King County shall provide the names and qualifications of all members of any quality assurance committee to the *Hammer* Plaintiffs' counsel upon request.

## SECTION 7.  MODIFICATION

    **7.1.**   King County may, at its option, elect to achieve the objectives of any provision of this Settlement Agreement by complying with recognized national correctional standards of the ACA or its successor regarding that provision.

    **7.2.**   If any provision of this Settlement Agreement becomes impossible of performance or would work an unreasonable hardship on King County due to circumstances beyond King County's control, or if it appears that the objective sought can be better achieved through modification of such provision, then King County shall submit such proposed modification to counsel for the *Hammer* Plaintiffs for their review.

    **7.3.**   If King County proposes to renovate the KCCF or any portion thereof such that there are structural or other significant modifications to the housing units then the following provisions shall apply:

SETTLEMENT AGREEMENT - 20

7.3.1.   King County shall notify counsel for the *Hammer* Plaintiffs of the proposed modifications.

7.3.2.   If the modifications proposed by King County comply with the ACA population or staffing standards adopted at the time of the proposed renovation, then the relevant capacities listed in paragraphs 4.2.1., 4.2.2., 4.2.3., and 4.2.4. above shall increase by the number of beds added to that portion of the facility when the renovation is completed and the staffing patterns set forth in paragraph 2.1. above may be modified consistent with ACA standards.

7.3.3.   If the modifications proposed by King County do not comply with the ACA population or staffing standards adopted at the time of the proposed renovation, then the parties agree to negotiate in good faith King County's proposal and any corresponding increases in the relevant capacities set forth in paragraphs 4.2.1., 4.2.2., 4.2.3., or 4.2.4. and/or the staffing patterns set forth in paragraph 2.1 of this Settlement Agreement, with the intent of assuring that changes  in capacities and/or staffing patterns shall provide comparable living space standards and security staffing that complies with the intent of the ACA standards and the intent of the other capacity and staffing provisions of this Agreement.

## SECTION 8.  OTHER MATTERS

8.1.     No Admission of Liability.  This Settlement Agreement is executed by the parties specifically for the purposes of resolving the *Hammer* Plaintiffs' equitable claims in the *Hammer* lawsuit.  It is expressly understood and agreed that this Settlement Agreement shall not constitute or be construed as an admission of liability on the part of King County

53430032

or any of the defendants in the *Hammer* lawsuit or as evidencing any admission of the truth or correctness of any claim asserted, or of any violation of law alleged by the *Hammer* Plaintiffs.

8.2.    Issues Resolved.  This Settlement Agreement resolves the equitable issues raised in the *Hammer* lawsuit and the issues involving the ongoing federal court supervision.  Nothing in this Settlement Agreement shall be deemed to waive the rights of any person to seek damages or other relief.

8.3.    Prior Agreements.  This Settlement Agreement modifies, supersedes and replaces any and all contractual provisions, promises, or covenants contained in any previous settlement agreements, stipulations, judgments, or orders signed or agreed to by the parties.

8.4.    Court Approval.  It is understood and agreed by the parties that if the Court fails or refuses to approve this Settlement Agreement or fails or refuses to dismiss the *Hammer* lawsuit, this Settlement Agreement shall become null and void and without any force or effect, and none of the parties shall be bound by it.

8.5.    Effective Date.  The terms of this Settlement Agreement shall be effective on the date that the *Hammer* lawsuit is dismissed by the United States District Court.

8.6.    Integration.  This Settlement Agreement contains the entire understanding between the parties and shall not be modified in any manner except by written agreement executed by all parties.

8.7.    Severability.  If any provision of this agreement or its application to any person or circumstance is held invalid, the remainder of this Agreement or the application of its provisions to any other person or circumstance shall not be affected.

SETTLEMENT AGREEMENT - 22

53430032

**8.8.**     Enforcement.  This Settlement Agreement is a contract and may be enforced according to the law of contracts of the State of Washington in a court of competent jurisdiction.  All remedies available under the laws of the State of Washington, including but not limited to specific performance, shall be available.

**8.9.**     Dispute Resolution.  In the event the parties disagree over King County's performance of their obligations under this Settlement Agreement, the parties shall first meet and confer in an effort to resolve the disagreement.  If the parties are unable to resolve the matter by meeting and conferring, the parties shall submit the matter to a mediator, to be chosen by the agreement of the parties, to mediate the issues raised by the parties prior to either party referring the matter to Court.

**8.10.**    Identification of Counsel.  ACLU-W shall keep King County informed of the names and addresses of cooperating counsel responsible for the implementation of this Settlement Agreement.

**8.11.**    Interpretation.  The table of contents and the section and subsection captions of this Settlement Agreement are for convenience only and shall not control or affect the meaning or construction of any provision of this Settlement Agreement.

**8.12.**    Authority to Sign.  Each signatory to this Settlement Agreement represents that he or she has the authority to enter into this Settlement Agreement.

///

///

///

SETTLEMENT AGREEMENT - 23

53430032

IN WITNESS WHEREOF, this Settlement Agreement is agreed to and executed by the parties this **11** day of **June**, 1998.

ACLU-W:

KATHLEEN TAYLOR
ACLU-W Executive Director

KING COUNTY:

RON SIMS
King County Executive

WILBORN KELLEY STEVENS

KATHLEEN TAYLOR
ACLU-W Executive Director
(Pursuant to a Limited Power of
Attorney executed on January 20, 1989)

Approved as to form only for King County:

NORM MALENG, Prosecuting Attorney

ROBERT I. STIER
Senior Deputy Prosecuting Attorney

MELTON ATKINS

KATHLEEN TAYLOR
ACLU-W Executive Director
(Pursuant to a Limited Power of
Attorney executed on February 14, 1989)

EDWARD BOEKEL

KATHLEEN TAYLOR
ACLU-W Executive Director
(Pursuant to a Limited Power of
Attorney executed on February 7, 1989)

CALVIN HAMMER

KATHLEEN TAYLOR
ACLU-W Executive Director
(Pursuant to a Limited Power of
Attorney executed on December 29, 1988)

SETTLEMENT AGREEMENT - 24