The Honorable John C. Coughenour

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| ABDIWALI MUSSE,<br><br>                                     **Plaintiff,**<br><br>v.<br><br>**WILLIAM HAYES, Director of King County Department of Adult and Juvenile Detention, and KING COUNTY, et al.**<br><br>                                     **Defendants.** | NO. **2:18-cv-01736-JCC**<br><br>**PLAINTIFF'S RESPONSE TO DEFENDANT KING COUNTY'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Noted for: February 19, 2021** |

## I.  INTRODUCTION

The plaintiff's claim in this case is that King County failed in its common law and constitutional duty to protect him from harm while he was held in its jail on November 1, 2015. The harm he suffered was extremely serious— fractures to his left orbital socket, severe dental injuries, and a traumatic brain injury that will impact him for the rest of his life.  The harm came at the hands of another jail inmate, Carl Alan Anderson, who was put in a general population cell with Mr. Musse and other pretrial detainees despite the fact he was violently mentally ill and dangerously assaultive.

Mr. Anderson was arrested that night for randomly attacking strangers on the streets of Seattle in a days-long "meth fueled rampage."  He was initially rejected for booking at the King County Jail and was taken to Harborview Medical Center for treatment.  The Emergency Room doctors at Harborview noted he was delusional—insisting that he was actually at a Thanksgiving dinner the police who brought him there were members of his family.

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6
7

Because of Mr. Anderson's obviously self-inflicted injuries and bizarre behavior, he would have been held at Harborview as a danger to himself or others if he hadn't been in police custody.  But when he was transported back to the Jail this history was ignored, and he was placed into an open-dormitory style cell with general population pre-trial detainees.  After pacing around the cell for a few minutes, speaking of demons that ordered him to hurt someone, he brutally attacked Mr. Musse, who was asleep on a bunk.

8
9
10
11
12
13
14

 The assault on Mr. Musse was completely preventable.  Plaintiff's evidence and experts will show that when Mr. Anderson was booked into the jail, it was or should have been apparent, even under King County's too-lax standards, that he was too dangerous to be housed in general population.  But Mr. Anderson was not isolated, and was able to attack Mr. Musse, because King County and its agents failed in their duty to protect persons held in its jail from dangerous inmates like him—that night, and in some respects for years.

15
16
17
18
19
20
21
22
23
24
25
26
27

The Jail Health Services nurse who was supposed to assess Mr. Anderson failed to recognize the obvious signs of his dangerous psychiatric condition.  He discounted the records from Harborview, and did not even complete the form that was to guide the evaluation and screening, before recommending Mr. Anderson for general population.  Instead, pursuant to the Jail's standard procedure, he based this decision on how Anderson appeared to him and what Anderson told him, and he did not share Anderson's medical and psychiatric information with the jail booking officers, who were separately responsible for determining whether he was safe to be in general population.  And—completing a perfect storm of individual- and policy-level failures—the booking officers were unable to make their own check of Anderson's jail record because the jail computer system was down that night, so they were placing inmates into general population without taking basic steps to determine if they were safe to be there.

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6
7

Plaintiff's evidence shows, and his experts will testify, that a person as dangerous as Mr. Anderson should never have been placed in general population—but he was, because of the jail's systemic failures and flawed classification policies and procedures, which foreseeably resulted in such errors.  It is indisputable that, if Mr. Anderson had been kept in isolation as he should have been—even temporarily, pending detoxification or psychiatric evaluation—he could not have endangered and attacked Mr. Musse as he did.    Summary judgment should be denied.

8

## II. STATEMENT OF FACTS

9

**1.  Carl Anderson is arrested for an unprovoked assault on Kevin Dares.**

10
11
12
13
14
15
16

This case has its genesis with an unprovoked and brutal assault that the perpetrator, Carl Anderson instigated upon a man named Kevin Dares.  See ***Ex. One.***[1] Mr. Dares was simply walking on a Seattle sidewalk when, without warning or provocation, Mr. Anderson punched him in the face. See ***Ex. Two***, Dares Decl, p.2.  It was obvious that Anderson was crazy or psychotic: as he continued to attack Mr. Dares, the two struggled, and Anderson kept smashing his own face into the cement, over and over.  Id. at 2:9-23.

17
18

**2.  Anderson is initially rejected at the King County Jail and transported to Harborview Medical Center**

19
20
21
22
23
24

Mr. Anderson was arrested for the assault on Mr. Dares and was taken to the King County Jail (hereinafter "the Jail").  A Pre-Booking Officer, Cortney Echternach, at the Jail declined to admit him because of his medical condition, and he was taken to Harborview Medical Center.  See ***Ex. Three***.  The reasons for this were not entered into the Jail's computer system, because the system was down that night.  See pages 7-9, below.  The only record made

25
26
27

---

[1] Unless otherwise indicated, the Exhibits referenced in this Memorandum are those attached to the Declaration of Jay H. Krulewitch (hereinafter "Ex. ___") submitted in its support.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 3

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

10633.1 hd101401

1   was - the Jail's paper Deferral Screening Form, which says this was because of "meth" and "low

2   blood pressure". See *Ex. Three.*

3          At the Harborview ER Department, Anderson was evaluated by Dr., Matthew Beecroft.

4   Dr. Beecroft noted he had numerous abrasions and other minor injuries—including "facial

5   lacerations" consistent with the self-inflicted injuries Mr. Dares described.  See *Ex. Four,* p. 1,

6   (HMC Records on Anderson).  Mr. Anderson's "History of Present Illness" was summarized as

7   follows:

8

9          The patient is a 32-year-old male brought in by the police after a proximally 30 hour
          meth-fueled rampage. The patient was a report reportedly walking around the city
10         punching people knocking down signs and getting into many altercations over the last 2
          days. He does not remember any of this time. He reports taking both meth and cocaine.
11         He is reporting pain in his right hand, neck, chest and low back.

12  Id. at p. 3.  Dr. Beecroft also noted: "The patient believes [he is] at Thanksgiving he is also

13  convinced that his family is with him however he is only accompanied by officers from [2]King

14  County Jail." Id. at p. 4.  Anderson was admitted for treatment at 22:25 (10:25 p.m.) and was

15  discharged back to the Jail just over three hours later, at 1:45 a.m.  Id. at p.1.  Dr. Beecroft will

16  testify that if Mr. Anderson had had come to the Harborview ER on his own rather in the custody

17  of  police officers, he would have been held as mentally ill and a danger to himself or  others.

18  See *Ex. Five*, Beecroft Decl., para. 8.

19

20      **3.  King County Jail Health Services Nurse Behauden Omer inadequately screens
            Anderson and recommends him for general population.**

21         When Mr. Anderson returned to the King County Jail from Harborview, King County Jail

22  Health Services  ("JHS") Nurse Behauden Omer was initially responsible for screening him to

23  identify an appropriate housing placement within the Jail.[3]  Jail records show Nurse Omer filled

24

25  _____

26  [2] Carl Anderson was brought to Harborview by an SPD Officer after the Jail had rejected Mr. Anderson for booking
    and processing, as noted above.  See *Ex. Three.*
27      [3] JHS nurses have the power to determine whether to place new arrivals into an appropriate health care
    service or general population  See *Ex. Six*, J-E-02; see also *Ex. Seven*, Omer Dep 49:15-19; See also *Ex. Eight*,
    Sanders Dep. 30:11-22.  JHS Operating Procedure J-A-01 states that all inmates booked into the King County Jail

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 4

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

10633.1 hd101401

1

2

out a - "Receiving Screening Form", although Nurse Omer has testified he has no  memory  of

dealing with Anderson that night. "  See *Ex. Seven* (Omer Dep), 43:7-17.  Nor does Nurse Omer

3

recall who the booking officer was that he worked with in  processing of Mr. Anderson, and he

4

did not write down the officer's name. Id. at 136:13-21.

5

6

According to written policy, in screening incoming inmates Nurse Omer was to inquire

7

into current and past illnesses, health conditions, or special health requirements, past or current

8

mental illness, including hospitalizations, history of or current suicidal ideation, legal and illegal

9

drug use (including type, amount, and time of last use), current or prior withdrawal symptoms,

10

and other observations of the inmate's behavior.  See *Ex. Six* (JHS Policy J-E-02), p. 5, 3(d).

11

But there is virtually no description of any type of mental history on Carl Anderson's form. See

12

*Ex. Ten.*  The form contains no indication that  Nurse Omer had reviewed past Jail Health

13

Service records or the records from Harborview where Anderson had just treated, or was aware

14

15

of the obvious signs of dangerous mental illness that were recorded there.

16

In deposition, Nurse Omer justified this on the ground that the Jail's practice was to base

17

housing decisions primarily on general observations of the incoming inmate in the booking area.

18

He said "housing decisions are made based on behaviors made in booking" and "the person's

19

20

current behavior determines where they will be housed in the – in the jail."  *Ex. Seven,* 39:3-13,

21

61:22-62:3. Mr. Omer testified that he takes whatever the patient says as the truth, that he cannot

22

judge them.[4] Id. at 78:9-17.

23

24

facilities are seen by a JHS RN as part of the booking process. . .  Their evaluation of each inmate is supposed to
include obtaining vital signs and completing a Receiving Screening standardized assessment which includes a

25

medical and psychiatric history. . . [I]nmates assessed to be at risk for suicide and/or requiring intensive psychiatric
services are sent to psychiatric housing . . , for her evaluation and treatment by a psychiatric evaluation specialist
(PES) or psych provider.  In Section (g), the policy states: "based on the receiving screening assessment, ITR nurses

26

recommend the appropriate housing placement for the inmate.  Housing options include General population (GP),
medical housing, infirmary, and psychiatric housing.  See *Ex. Nine.*

27

[4]Nurse Omer said over and over again when Mr. Anderson did not report a fact, he did not document it in
his RSF.  - See *Ex. Seven,* 80:1-81:24. When asked why he did not write down that Anderson was using cocaine, he

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 5

10633.1 hd101401

1

2   Consistent with this, although Mr. Omer claims he saw seen Anderson's Harborview

3   records, and those records are attached to Anderson's Receiving Screening Form, he failed to

4   list or include any of the critical facts they described on the Form itself.  Id. at 71:23 - 72:6,

5   80:1-87:24.  When asked about this, all he would say is "I documented my assessment".  Id. at

6   80:1-82:6.  He said that he did not mention or include any of the critical facts noted at

7   Harborview because "it wasn't part of the receiving screening form".  Id. at.[5]  He added "I

8   documented what I feel is pertinent to the situation.  And the encounter was clearly documented.

9   This was a record that the – that I haven't – that has – was not reported to me".  Id. at 81:3-24.

10   Mr. Omer also testified that in making his housing recommendation, he did not have any

11   information regarding Mr. Anderson's prior jail psychological treatment history going back to

12   2005 because he did not have that information available at the time of the interview.  Id. at

13   110:13-112:24.  In addition, Mr. Anderson did not report it to him during the receiving screening

14   interview. Ex. 10-  Confronted with records showing that Anderson had been previously

15   diagnosed *by JHS* as suffering from schizophreniform, a diagnosis closely related to

16   schizophrenia, and suffered from command hallucinations telling him to hit or attack people,

17   Nurse Omer said that he believed that information was in paper records he did not have access

18   to.  See ***Ex. Seven***, Omer Dep., 114:2-117:12, 110:25 - 111:18;110:13-111:23.

19

20

21   [5] said "he did not mention that, so I cannot document items that wasn't reported to me."  Id. at 87:5-89:23. .  When it

22   was pointed out that this was documented in the Harborview record, he replied, "I referred it in my note. Say: see scanned outside record."  Id. at 87:5-24.  When asked why he did not include the actual information in his note, he

23   responded "My note is based on patient interview".  Id..  When pressed on this issue, he said, "it was referred in my notes to be reviewed by a medical provider the following day and bordered and highlighted. There was an encounter

24   before he came to jail that he was seen at Harborview …."  Id. at89:4-23.  When asked if he knew what Anderson was arrested for, he said "That's not information we routinely seek or somebody tells us.  It's not part of the intake

25   process, asking for a crime."  Id. _.

26   [5]Dr. Benjamin Sanders, King County's Director of Public Health, similarly testified that the prior Harborview records were merely considered "history" on an inmate, and were less important than an assessment

27   conducted by a JHS Nurse in the booking section of the jail.  See ***Ex. Eight***, 75:1-16;45:5-48:16; see also id. at 118:-8 16 - ("it is more important how the patient presents when he arrives in the jail than how he may have presented sometime before that and even earlier than that by history").

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 6

1
2
3
4
5

        This appears to be true.  Dr. Benjamin Sanders, the King County Director or Public

Health, confirmed in deposition that these "older paper records" from before 2005 were never

made part of the JHS Electronic Medical Record System but were stored in an Iron Mountain

archive facility.  See *Ex. Eight*, Sanders Dep. 52:23-54:9; See *Ex. Thirty Five.*

6

### 4.  Jail booking officer(s) assign Anderson to general population, unaware of his psychiatric record and without a routine background check of Jail records.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

        Although King County has identified Correctional Officer - Chris Johnson as the officer

who actually booked Mr. Anderson that night, Officer Johnson has testified he has no memory of

dealing with Anderson on the morning in question, November 1, 2015.  See *Ex. Eleven,* Johnson

Dep. 13:1-25;26:20-23;27:15-25;28:1-3;90:9-13.  There is a Jail record that indicates that Officer

Johnson handled the property taken from Mr. Anderson during the booking process, but there is

no other record of his involvement.  Id. at 93:21-25;94:1-4;101:20-24. In addition, none of the

other Correctional Officers who King County has said were working in the booking/ITR (Intake

and Release) section of the jail during the third shift, from 10:20 p.m. until 6:30 p.m. that night,

have any memory of dealing with Anderson on November 1, 2015. See *Ex. Twelve*, Wilkerson

Dep. 17:6-13;22:14-17; *Ex. Thirteen,* Chasengnou Dep. 29:17-21; *Ex. Fourteen,* Hardt Dep.

12:2-9;13:21-25;14:1-8; and *Ex. Fifteen*, Henson Dep. 8:18-20, deposition excerpts of jail

booking officers listed on *Ex. Sixteen*, King County's supplemental answer to Plaintiff's

interrogatory number six.

22
23
24
25
26
27

        Although there is no record or memory of what officer gave Anderson his cell assignment,

it is clear that whoever it was had no additional information about him beyond Nurse Omer's

housing recommendation.  The booking officers were unaware of any of the information in the

Harborview records because, Mr. Omer has testified, "It's not standard procedure to share patient

medical records with the booking officers."  Id. at 83:1-3; see also *id.* at 100:20 - 101:2 ("[I]t

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1    isn't the practice to share medical information with booking officers."); *id.* at 105:3-5 ( "It's not

2    a standard procedure to discuss history with booking officer.  It's not a standard operating

3    procedure.")

4         The booking officers were also unaware of Mr. Anderson's history with the Jail because

5    the Jail's computer system was down that night and his record and background information could

6    not be accessed.  See ***Ex. Sixteen.***  According to Glenn Evans, a King County IT Official, this

7    was because the jail computer was undergoing a major upgrade this weekend, i.e. from Saturday,

8    October 31, 2015 at about 4:30 p.m. to Sunday, November 1, 2015 at about 7:00 p.m.  ***Ex.***

9    ***Seventeen,*** Evans Dep., 10:13-11:14.  This was part of a system-wide upgrade for all or most of

10   King County's computers.   Id. at 51:10-52:13.  In his first deposition, Mr. Evans first testified

11   that the system was shut down completely during this upgrade.  See Id. at 10:10-11;4.[6]  At a

12   subsequent deposition, Mr. Evans' recollection changed, and he said that during this upgrade, the

13   Jail would be put into a limited inquiry status, which meant that the computer would be available

14   for making inquiries (i.e. accessing data) but not for inputting data.  Id. at 67:4-70:9; 71:9-74:13.

15   But this plan either was not implemented or simply did not work.  When asked about who was

16   responsible for putting the Jail computer into "limited inquiry status" during this project, Mr.

17   Evans could not say:  the section of his project deployment checklist that was to indicate who

18   was assigned that task was blank.  Id. at 88:8-89:25; see also ***Ex. Eighteen***, Glenn Evan'

19   Deployment Checklist.   And Mr. Evans never checked to see if, in fact, the limited inquiry

20   status was working during this critical weekend.  Id. at 92:21-94:2; 97:5-21;107:10-113.23.[7]

---

[6] At his first deposition, Mr. Evans stated that the jail would be using a manual or paper booking method to book new inmates into the jail, that this was his understanding.  Id. at 11:5-12:9.

[7] Mr. Evans testified that this Jail Mainframe Rehost Project took 26-27 hours to complete from Saturday, October 31, 2015, at 4:30 p.m. through Sunday, November 1, 2015 at about 7:00 p.m. id. at 10:13-11:4: 112:6-18.

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

In fact, it wasn't.   On the night of the assault on Mr. Musse, Corrections Officer Duc Le made a notation in the 9th Floor Logbook that the jail computer was not accessible; and he so testified at his deposition.  See ***Ex. Nineteen***, 9th Floor  Logbook, p.16. See ***Ex. Twenty***, Le Dep. 29:6-33:22. Sgt. Gordon Gaynor similarly wrote in his Supervisor's Incident Report on the Anderson/Musse assault that the jail computer was down, and he also testified to this fact at his deposition. See ***Ex. Twenty-One***, SIR, 16, p.2. See ***Ex. Twenty-Two***, Gaynor Dep.at 69:24-75:4.[8]  Commander Clark had written an operations order[9] which, for the booking section, relied upon the expectation that the computer would be in this so-called limited inquiry status.  But Commander Clark had no back-up or contingency plan for what the booking section should do if the limited inquiry status did not work. See ***Ex. Twenty-Three,*** Clark Dep. at 115:3-116:1; 146:21-151:7.[10].  In essence, as plaintiff's expert will testify, this meant that the booking section of the jail was "flying blind" that weekend as they had no way to check the Jail's records on the background or classification of incoming inmates.

**5.   Within minutes of entering the general population cell, saying demons were ordering him to hurt someone,  Anderson brutally assaults Wali Musse.**

Mr. Anderson was sent to the Ninth Floor at about 3:00 a.m. and placed in unit 9SUB, an open dormitory-style unit which housed a number of pretrial detainees, including plaintiff Wali Musse.  See ***Ex. Nineteen***, p. 19.  Mr. Musse had never been in jail before, and had been arrested just a few hours earlier for DUI. See ***Ex. Twenty-Six,*** Musse Dep., 70:16-18. In the cell he

---

[8] Sgt. Gordon Gaynor testified that there is a lot of information on the jail computer and that the whole jail, in effect, is affected when the computer goes down. Id. at 64:13-69:23.  He further stated that it was his understanding that when the computer went down, the booking section would hold people down there in side cells until the computer came back up.. Id. at 68:24-69:23.  He further stated that the fact that the jail mainframe computer was down made it difficult for him to do his job and to prepare a witness list of inmates to be interviewed which he would have attached to his SIR report (ex. 15), which is something he would normally do. Id. 132:-135:1.
[9] See Ex 18, Commander Clark's operations order, pp. 8-9
[10] Commander Clark relied upon the fact the computer was to be in limited inquiry status and even drafted an operations order for the rehost project for how booking/ITR was to function during this time.  But he did not craft any policies or procedures for what booking/ITR officers were to do if, in fact, the limited inquiry status for the main frame computer was not employed, did not work, or failed.  See id. at 158:17-172:5; See also Ex. 34.

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 9

10633.1 hd101401

decided to keep to himself:  he spoke to no one, but picked out a bunk—he recalls it was either number 9 or 11—and laid down and tried to go to sleep.  See ***Ex. Twenty-Four***, Declaration of Wali Musse; see also ***Ex. Twenty-Five,*** photos of 9SUB.  The next thing he remembers he was awakened by "a big hit" in the face.  See ***Ex. Twenty-Six,*** Musse Dep. 82:19-83:4.  He woke up screaming, dazed from being hit so hard in the face. Id. at 83:5-7. When he could open his eyes and get his senses back, he saw a man in a fight posture—Anderson, he later learned--moving right in front of him.  Id. at 83:5-10.  When he asked the man why he hit him, the man said something unintelligible and started hitting him again.  Id. at 83:10-21.  He tried to grab onto the man to minimize the blows, but was struck in the face, teeth, lips, and all around.  Id. at 83:21-24.  He heard an inmate say "get down, get down" and Anderson pulled away;  Mr. Musse thinks that jail correctional officers came in at that point.  Id. at 84:4-8.

According to Sgt. Gaynor's Supervisor's Incident Report, when he came to 9SUB, he saw Mr. Musse laying near the door in a prone position.  ***Ex. Twenty-One***, p.2. He ordered the door open and both inmates were handcuffed.  Id.  Officer Heberling had identified Carl Anderson as the aggressor and escorted him to the eleventh floor while Mr. Musse was helped to a nearby bunk.  Id.  Sgt. Gaynor requested medical aid and four JHS nurses came to the unit to administer first aid.  Id.  Mr. Musse was then transported to t Harborview for his injuries.  Mr. Anderson was given an infraction. Id. at 84:4-8.

According to Sgt. Gordon Gaynor Supervisor's Incident Report, this incident began at 3:18 a.m., a mere eighteen minutes after Mr. Anderson was put into 9SUB. ***Ex. Twenty-One***, p. 1. Cantrell Winston, another inmate housed in 9SUB at the time, remembers an "African American male"[11] being  brought into the cell and "acting strangely," "pacing around, saying

---

[11] Jail booking records show that - Mr. Anderson -is an African-American male.  Mr. Musse is an African male as well.  -

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1   things that made no sense.  He was hovering over this African American male who was sleeping.

2   He was talking to himself saying things like we were talking about him and that he wanted to

3   hurt someone and the Demons were going to make him do it."  See ***Ex. Twenty-Seven***, Winston

4   Decl, para. one.  Mr. Winston will testify that "[s]uddenly, without provocation he attacked the

5   African American sleeping man.  I saw him hit him at least twice in the head before the man

6   jumped up and began defending himself".  Id.  Mr. Musse was told much the same thing by other

7   inmates in 9SUB upon his return from Harborview after being treated for his injuries.  See ***Ex.***

8   ***Twenty-Eight,*** Musse Statement, p. 4.

9

10      **6.  Although Mr. Musse was badly injured and Anderson was charged with a felony,
             the Jail  erases its video record of Anderson's conduct and the assault.**

11          Kurt Stark, an officer with the Jail Criminal Investigations Unit, was assigned to

12   investigate possible criminal charges to lodge against Mr. Anderson.  Although Mr. Stark learned

13   that Mr. Musse sustained serious injuries in this incident, and Anderson was charged with felony

14   assault on Mr. Musse, Mr. Stark did not interview any of the inmates in cell 9SUB, take any

15   photographs of Mr. Musse's injuries (or the injuries to  Mr. Anderson's fists), collect any of Mr.

16   Musse's  bloody clothes, or request to have the surveillance camera video recording of the

17   incident preserved.  See ***Exhibit Twenty-Nine***, Stark Dep. 31:7-32:16; 33:3-34:16; 37:12-39:1;

18   39:2-44:15.  According to Officer Stark, neither did anyone else at the Jail.[12]

19

20          Unit 9SUB had two working video recording cameras at the time, according to Paul

21   Allyn, the video recording specialist whose company installed them.  See ***Exhibit Thirty***, Allyn

22   Dep. 17:16-20:14; 18:12-20:14.  Mr. Allyn testified that these two cameras, between them,

23   would have captured all or almost all of the incident in question. Id. at 18:24-19:15; 22:8-

---

[12] Sgt. Gaynor stated that he had wanted to take photographs of Mr. Musse's injuries but his Jail-issued digital camera did not have working batteries.  See ***Ex. Twenty-Two, 123:5-125:6.***

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

43:17.[13]   But any such video clip was permanently destroyed when no one in the jail took any action to preserve them before the video recordings were recycled after sixty days.  See ***Exhibit Thirty-One***, King County Rog Answer on Video Evidence, See ***Exhibit Thirty-Two***, Jail video retention policy.[14]

## IV.   ARGUMENT

**I.   PLAINTIFFS' EVIDENCE AND EXPERTS SHOW THAT HIS INJURIES WERE CAUSED BY AN INMATE SCREENING PROCESS THAT CREATED AN OBJECTIVELY UNREASONABLE RISK TO INMATES' SAFETY** .

Defendants Memo correctly sets for the legal standards governing This Motion. It turns on whether they have shown "there are no genuine issues of material fact remaining for trial" "viewing the evidence in the light most favorable to the nonmoving party."  Def. Mem. SJ at 8. The facts that are material to the plaintiff's federal civil rights claim in this case—what Defendants call "a failure to protect claim under the Fourteenth Amendment" are whether

> 1) the defendant made an intentional decision with respect to the conditions under which plaintiff was confined; 2) those conditions put plaintiff at substantial risk of suffering serious harm; 3) the defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendant's conduct obvious; and 4) by not taking such measures, the defendant caused the plaintiff's injuries.

Def. SJ Memo at 9 (quoting *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070-71 (2016)). While correctly listing these material factual elements, the Defendants' Memo spends little time actually discussing the evidence relevant to them.  They skip over the evidence that shows a constitutional violation occurred, focusing instead on who bears responsibility for it.  That has it

---

[13] Mr. Allyn also talked about how easy it would be to preserve a video clip of the incident.  He indicated that the whole process would probably take about five minutes by someone trained in preserving or archiving video clips. Ex. 25, Allyn Dep. 43:18-53:18; 57:20-61;24.

[14] According to DAJD Policy 4.01.023, "[w]hen any of the following occurs: incident which require a preliminary investigation, inmate suicide . . . injury to staff and/or inmate; criminal behavior; and/or alleged misconduct, the shift captain shall export any video of the incident to the archived video filed."  See Exhibit ___. Jerry Hardy, the shift captain on the night of the incident, admitted he failed to export a copy of the video clip of the incident as required under this policy.  See Exhibit 32.

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

backwards:  responsibility for a constitutional violation cannot be assessed until the decisions and actions that make out the violation are identified.

In this case, as described above, plaintiff's evidence and expert witnesses will identify a number of decisions and actions that, individually and in combination, exposed the plaintiff to an unreasonable risk of assault from Mr. Anderson.   Consequently, there are a number of facts and factual disputes material to each element of plaintiff's constitutional claim.

**1.      The dangerous custody condition and the decisions that created it.**

The dangerous condition that resulted in the plaintiff's injuries was the unknown and unexpected presence in his cell of a delusional and uncontrollably assaultive man.  That condition was most immediately created by the decision to put Carl Anderson in general population..  According to plaintiff's evidence, at the time that decision was made Anderson was obviously delusional and assaultive and  had been in that state for days. He had visible self-inflicted injuries to the hands and face for which he was seen at Harborview immediately before his booking.  The Harborview records and the Jail's Probable Cause Certificate showed that Anderson that he had been on a "meth fueled rampage", hitting people and objects for some thirty hours.  He told the Harborview doctors that he was at a Thanksgiving dinner and the police officers who brought him to the hospital were his family.  When he was sent back to the Jail,  the first independent witnesses to see him—other inmates in the cell where he was placed with the plaintiff—report that he was immediately violent and threatening, speaking of demons who were commanding him to attack someone.  Then—just eighteen minutes after entering the cell—it is undisputed that he made a violent and unprovoked  assault on a complete stranger, Wali Musse, just as he had assaulted other innocent bystanders on the street in the hours  before his arrest.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 13

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

This evidence plainly supports the inference that it was or should have been apparent to - Nurse Omer and the jail's booking officers that Anderson was mentally ill and dangerous and was not fit for general population.  There was other evidence that would have borne powerfully on the issue, including surveillance video in the cell that would have shown both the attack and Anderson's behavior before it.  But although they knew the severity of plaintiff's injuries and the violent, criminal nature of the assault, King County allowed the video of the incident to be recycled and destroyed.  The County has not explained how it could have done this in good faith, and plaintiff's evidence—particularly, Mr. Winston's testimony and the contemporaneous notations that the attack on Mr. Musse was unprovoked—shows he was clearly prejudiced by it. That evidence of prejudice warrants an inference that the video would have supported plaintiff's claim that Anderson was acting overtly psychotic and dangerous.  FRCP 37(e)(1), provides that, "if a party should preserve electronically stored information for litigation but loses it by failing to take reasonable preservation steps, the court upon finding prejudice 'may order measures no greater than necessary to cure the prejudice'"—and those measures may include taking the opposing party's relevant assertions of "fact as true." *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 627–28 (7th Cir. 2018).  The only evidence that Mr. Anderson was *not* obviously mentally ill and dangerous is the inadequate assessment of him by Nurse Omer, which plaintiffs evidence shows was flawed in multiple ways.  A jury could easily find that, despite the fact that the Jail's records don't reflect it, it was and should have been obvious when Anderson was assigned to a general population cell that doing so was foreseeably creating an unreasonable risk to the other detainees there. See ***Ex. Thirty Six***, p.10.

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 14

10633.1 hd101401

1

2        Discovery, and plaintiff's experts, have shown that the ultimate decision to put Anderson

3  in  general population l was itself the product and foreseeable result of a number of other, earlier

4  administrative decisions and informal Jail policies that foreseeably led to such errors.

5        One was the decision to make classification decisions without regard to inmate history,

6  even including recent assessments by physicians made just minutes before.  Nurse Omer testified

7  this was the Jail's standard practice: "housing decisions are made based on behaviors made in

8  booking" and "the person's current behavior determines where they will be housed in the – in the

9  jail."  See *Ex. 7*, 39:3-13, 61:22-62:3.  King County Health Director Sanders himself confirmed

10  this is what Jail nurses like Mr. Omer are told.  See note 5, p.6. above.  According to Nurse

11  Omer, he simply accepted what newly arrived inmates tell him, even about their psychiatric

12  history and drug use, without regard to available evidence to the contrary. See pages 6-7 above.

13  Plaintiff's experts will testify, as common sense shows, that this foreseeably leads to just the

14  kind of dangerous error that occurred here.  See *Ex. 36*, pp. 20-21.

15

16        Consistent with this flawed practice, King County's Jail Health administrators made a

17  decision not to incorporate inmate medical and psychiatric records in the computerized health

18  record system that was available to its screening nurses. See page 6 above.  As a result, neither

19  Nurse Omer nor the booking officers were aware that the Jail's own records indicated that Mr.

20  Anderson had a history of mental illness and hallucinations telling him to attack people. Id.

21

22        Similarly, Nurse Omer testified that it was his and King County's  practice not to have

23  the screening nurse share any medical records or information about new arrivals they do have

24  with booking officers. Again, according to plaintiff's experts, this practice was completely

25  wrong and unsafe and bound to lead to dangerous consequences for inmates in the jail.

26  According to Mr. Schwartz:

27

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

> The reason the documentation about Carl Anderson's current condition and his Meth-fueled rampage was not reviewed was because King County had failed to train KCCF staff and Jail Health Services (JHS) staff on HIPPA and both staffs wrongly believed relevant health information could not be shared with correctional staff.  The idea that HIPPA prohibits sharing medical or mental health information with correctional staff even if that information is important to the safety of staff, inmates, or the facility, is simply a myth.  The Act actually provides a major exclusion for correctional facilities from its information restrictions.

Ex., 36, p. 15.  Finally, the Jail's administrators, including Director Hayes, made a decision to continue to assign new inmates to general population while the Jail's own computerized custody records were unavailable because its system was undergoing an upgrade.  Although the responsible Jail officials have given contradictory testimony about this, belatedly claiming that the computer system was supposed to be in a "limited inquiry status" which allowed the booking officers some access, a jury could find to the contrary from their initial admissions and the circumstantial evidence.  See page 8-9 above.  Had those records been accessible, they would have shown that Anderson had an extensive and violent criminal history, including a history of jail infractions and custodial assault.  See *Exhibit Two*, pp. 11-12, Schwartz Decl.  Plaintiff's jail expert will testify—again, consistent with common sense—that without access to this kind of information "it would be dangerous to send the person to the ninth floor."  See id. at 12.

### 2.   The defendants' failure to take reasonable measures to abate the risk.

At each decision-making step, the Jail and its agents failed to take reasonable, available measures to abate the risk that Mr. Anderson posed to other inmates.

The measure that could and should have been taken by Nurse Omer and the booking officers was simple:  Mr. Anderson should have been housed in a psychiatric unit, isolated from general population, at least until his symptoms abated or he was given a further psychiatric

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1

2

evaluation.  This was what the Jail's written policies, standard correctional practices, and the

Hammer consent decree all called for in such circumstances. See *Ex.* 36, p. 7-9, *Ex.* 37, p. 10.

3

4

5

6

7

8

9

10

11

12

13

Similarly, rather than relying on their screening nurses' superficial observations during

the booking process and whatever the inmate chose to tell them, the Jail and its administrators

could have trained them to take into account and consider inmates' recent psychiatric history,

and the behavior that brought them to the Jail.   Or, at the least, it could have given its screening

nurses access to its own records of inmates' previous psychiatric and medical condition and

treatment that were made before those records were computerized in 2005, simply by scanning

those records into its system.  Instead, it sent all the records from those years—even for frequent

Jail admittees like Mr. Anderson—out to storage, where they were inaccessible to anyone in the

Jail and useless for screening or any other purpose.

14

15

16

17

18

19

20

Alternatively—or, better, in addition—the Jail could have allowed its screening nurses to

share pertinent psychiatric information with the booking officers who were equally responsible

for making the classification decision.  Plaintiffs experts will testify (and a review or relevant

laws would confirm) that the idea that this would violate HIPPA was mistaken and unfounded—

and, in fact HIPPA, contains a specific exception to its privacy requirements that allowed

correctional institutions access to such highly relevant information.  See *Ex.* 36, p. 15.  .

21

22

23

24

25

26

27

Finally, during its computer system upgrade in effect the night Mr. Anderson was

booked, the Jail and its administrators could have arranged for its booking officers to have access

to the jails computerized custody records, rather than having them fly blind by making housing

decisions without access to the most basic and relevant background information.  It could have

done this, as IT manager Glen Evans testified, by putting the system into a "limited inquiry

status" which would have allowed the booking officers to access information in the system even

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 17

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6
7
8

if they could not input new information at that time.  See page 8-9 above.  But Mr. Evans own

original testimony, and that of the booking officers who was working at the time, indicate that

was not done.  Id. Absent that, the Jail could have followed what one of its  pre-booking officers

said was  the usual procedure that was  followed when the computers went down ---  the intake

process would be "paused", which meant that new inmates would be held in the intake area until

the computer was working again and their backgrounds could be checked.  *Ex.* 36, pp. 12-13.

Defendants have offered no explanation as to why this was not done. Id

9

     **3.**     **The foreseeable result of the defendants' decisions.**

10
11

     There can be little question that each of these flawed decisions caused or contributed to

the dangerous condition that caused plaintiffs' injuries.

12
13
14
15

     Obviously, if the decision to place Anderson in general population rather than in isolation

or a psychiatric had not been made, the danger he presented to others confined with him would

never have been created, and Mr. Musse would never have been injured.

16
17
18
19
20
21
22
23
24
25

     If Nurse Omer had included in his decision making even the most recent records of Mr.

Anderson's mental health history—the Harborview records—he would have known that

Anderson was having delusions and had spent the previous thirty hours irrationally attacking

other people and injuring himself.  If he had had access to Anderson's full Jail medical history,

he would have known that he had a previous mental diagnosis and delusions that led him to

attack people irrationally—just as he did in the hours before his arrest, and again minutes after he

was put in a cell with Mr. Musse.  A reasonable juror could easily conclude that if Nurse Omer

had considered those things—or if he had conveyed any of them to the booking officers—more

likely than not, they would not have sent Mr. Anderson into general population.

26
27

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1

2       Likewise, a reasonable juror could conclude that if the Jail booking officers had known

3   what about what was in the Jail's custodial computer system about Mr. Anderson he would not

4   have been casually assigned into general population as he was.

5       As to each of these policy decisions and practices, a jury could well find all the elements

6   of the kind of constitutional violation defined in *Castro*.  Plaintiffs' evidence is more than

7   sufficient to established that, in each of these respects, Mr. Musse's constitutional right to be

8   kept safe while in custody was violated.

9   ## II.   DEFENDANT HAYES BEARS SUPERVISORY RESPONSIBILITY FOR THE VIOLATION OF PLAINTIFF'S RIGHTS BECAUSE HE DIRECTLY PARTICIPATED IN THE JAIL'S DECISION TO "FLY BLIND" AND PLACE INMATES IN GENERAL POPULATION WITHOUT BACKGROUND CHECKS WHILE ITS COMPUTER SYSTEM WAS BEING UPDATED.

10

11

12       According to the 9th Circuit Court of Appeals:

13       A defendant may be held liable as a supervisor under § 1983 "if there exists either (1) his
14   or her personal involvement in the constitutional deprivation, or (2) a sufficient causal
     connection between the supervisor's wrongful conduct and the constitutional violation."
15   *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir.1989). "[A] plaintiff must show the
     supervisor breached a duty to plaintiff which was the proximate cause of the injury. The
16   law clearly allows actions against supervisors under section 1983 as long as a sufficient
     causal connection is present and the plaintiff was deprived under color of law of a
17   federally secured right." *Redman*, 942 F.2d at 1447 (internal quotation marks omitted).

18   *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011).

19

20       In the case at hand, Director Hayes was directly involved with the Jail Mainframe Rehost

21   Project but delegated the task of developing the jail policy for this project to Major Clark (who is

22   now Commander Clark).  Director Hayes cannot escape liability for claiming that it was Major

23   Clark who failed to make sure that the booking section of the jail had procedures in place to deal

24   with new inmate in the event that computers were shut off completely.  That was his duty as the

25   top official for the jail, that was his responsibility to make sure such procedures were in place.

26

27

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 19

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

10633.1 hd101401

1  His failure directly led to Carl Anderson being placed on the 9th Floor when the Jail knew so

2  little about his classification history or his background.

3      Likewise, Director Hayes failed to have policies in place which would ensure that JHS

4  Nurses would share psychiatric information with booking officers.  That failure, again, led to the

5  terrible and ill-informed decision to recommend Carl Anderson for general population.  This is

6  exactly the kind of deliberate indifference the court found actionable in *Peart  v. Seneca County*,

7  808 F.Supp. 2nd 1028, 1033 (N.D. OH 2011).

8  **III.   KING COUNTY IS RESPONSIBLE FOR THE VIOLATION OF
       PLAINTIFF'SRIGHTS BECAUSE IT WAS CAUSED BY WIDESPREAD AND
       ESTABLISED COUNTY POLICIES**.

9

10      For the same reasons Director Hayes is liable under *Starr v. Baca*, King County is also

11  liable for the constitutional violations that occurred in this matter.  According to *Castro*:

12

13      The Supreme Court has strongly suggested that the deliberate indifference standard for
       municipalities is always an objective inquiry. In *City of Canton*, which concerned a
       Fourteenth Amendment claim for failure to train, the Court held that a municipality was
       deliberately indifferent when "the need for more or different training is so obvious, and
       the inadequacy so likely to result in the violation of constitutional rights, that the
       policymakers of the city can reasonably be said to have been deliberately indifferent to
       the need." Id. at 390. The Court articulated a standard permitting liability on a showing of
       notice: "Where a § 1983 plaintiff can establish that the facts available to city
       policymakers put them on actual or constructive notice that the particular omission is
       substantially certain to result in the violation of the constitutional rights of their citizens,
       the dictates of *Monell* are satisfied." Id. at 396 (emphasis added).

20  833 F.3d at 1076;[15] *accord, Estate of Yoemans v. Campbell*, 2020 U.S. Dist Lexis 215482 (N.D.

21  Colo 2020). In *Yeomans*, the court found that the plaintiff did establish a claim of municipal

22  liability with facts remarkably close to the case at hand.

23

24  [15] If the Court were to find plaintiff's evidence insufficient to support his Section 1983
    claim against King County under the established law cited herein, plaintiff would submit that law
25  should be reconsidered.  As a panel of the Seventh Circuit wrote just this month, the governing
    caselaw's "doctrinal elaborations [regarding] … *Monell* liability rather than respondeat superior
26  … bears only a tenuous connection to the text of § 1983, let alone to its history."  *Howell v.
    Wexford Health Sources, Inc*., ___ F.3d ___, 2021 WL 405006, at *4 (7th Cir. Feb. 5, 2021),
27  (quoting and citing Board of County Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 430 (1997)
    (Breyer, J., et al., dissenting); John C. Jeffries, Jr., The Liability Rule for Constitutional Torts, 99

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1

2

3

4

5

6

7

8

9

10

> Plaintiffs argue that the policies for housing individuals was constitutionally deficient because the classifications unit did not have access to important records, including certain mental health records. Plaintiffs' expert acknowledges this practice and states that "it is impossible to reasonably ensure safety unless the jail ensures appropriate personnel have the information needed to make housing decisions." ECF No. 91-11 at 11. Additionally, plaintiffs' expert cites to an ACDF policy that allegedly was systemically not followed. The policy reads "seriously ill, mentally disordered, injured, non-ambulatory, sexual predators, protective custody or other special needs inmates . . . are housed in single occupancy cells or in the medical unit to provide continuous observation and care." Id. at 5. Despite this policy, classifications specialists did not consider an inmate's physical health when making classifications assessments. As defendant Campbell stated, "physical health has no effect on [an inmate's] classification level." ECF 91-2 at 122. Plaintiffs have presented evidence that raises -  the question of whether the classifications process at ACDF was constitutionally adequate given classifications employees (1) being unable to access mental health records, and (2) not considering an inmate's physical health during the classifications process despite having a policy requiring single cells for "seriously ill, mentally disordered, [or] injured" individuals.

11

See id. at ___.

12

13

14

15

16

17

18

19

20

21

22

> In the case at hand, much like *Yoemans*, the jail charged the JHS Nurse with making a mental health assessment after a short interview with the new inmate, but that information was never shared with the booking officer and/or booking department.  As a result, the correctional officers who were charged with booking new inmates into the jail have routinely been prevented from having access to information on inmates with a history of mental health issues and/or psychiatric problems.  Similarly in this case, Nurse Omer says he was just following the established practice in King County not to have its jail nurses share psychiatric information with booking officers.  The jail nurse did not have the complete picture of the inmate.  They did not know the inmates' booking and classification history.  Likewise, the booking officer did not have

23

24

25

26

27

VA. L. REV. 207, 208 (2013); Karen M. Blum, Section 1983 Litigation: The Maze, the Mud, and the Madness, 23 WM. & MARY BILL RTS. J. 913, 913-14 (2015)).  That is especially so in a case like this, where the constitutional violation was caused by the interrelated decisions, actions and practices of a number of County employees, officers and administrators-=-some of whose identities are unknown because they were not properly recorded—and the County is indemnifying and jointly defending all of them. See Bryan, 520 U.S. at 436-37.
Plaintiff recognizes that this Court is bound by this Supreme Court precedent, but to preserve the issue for appeal nonetheless submits that, in these circumstances at least, the County's liability should be assessed under the common law principles of respondeat superior that were in force in 1871, when Section 1983 was enacted.

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 21

10633.1 hd101401

the critical psychiatric information to help determine the safest housing classification for the new

inmate and the other inmates in the jail.   They were not given critical Harborview treatment

records on inmates, nor were they provided critical psychiatric records which would be useful in

making a proper classification or housing decision with a new inmate.  Both sides of this

situation, the jail correctional officers and the JHS nurses, all were laboring under the mistaken

notion that HIPAA prevented the sharing of that information.  But this is simply not correct.

Plaintiff's corrections expert, Mary Perrien, who has substantial experience with regard

to jail and prison mental health services, has stated as follows:

> If booking staff had any questions regarding the effect of methamphetamine and cocaine
> (the cocaine RN Omer failed to note), this could have easily been discussed both in a
> general and specific manner since there are exceptions regarding protected information
> that allow for it in cases of safety and security.. Mr. Anderson's volatility combined with
> his disciplinary risk score from his history at KCJ and recent methamphetamine
> intoxication should have placed him at risk of increased violent action toward other
> detainees. He should not have been housed with non-violent detainees such as Mr.
> Musse.

See *Ex.* 37, p. 14.  Ms. Perrien also noted:

> RN Omer had the Harborview emergency department records in his hands and admitted
> in his deposition that he chose not to look at those records, despite the additional
> information that they would have provided. Medical Director Dr. Sanders indicated in his
> deposition that nursing staff are trained to prioritize the information provided by the
> detainee present in front of them over any "historical" data. However, the data provided
> by Harborview was recent and also more objective. Both Dr. Sanders and RN Omer
> should have known that detainee self-report must be viewed in the context it is obtained
> and balanced with objective data and collateral information. The Harborview records
> would have been extremely valuable in this case in determining that Mr. Anderson should
> have been held in a booking cell or a psychiatric cell for further evaluation.

See id. at 13.  In addition, the jail did not differentiate putting low-risk, non-violent vulnerable,

pre-trial detainees in open dormitory style cells with returning inmates with an extensive violent

history or criminal history with violent offenses.  To put a first time arrestee like Mr. Musse in

the same cell with an inmate like Carl Anderson who had an extensive criminal history,

including assaults, violent felonies, and a prior sex offense, as well as a longstanding psychiatric

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 22

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6

history of treatment in the jail, itself, was deliberately indifferent as it created a substantial risk of harm to Mr. Musse.  This was no accident or single mistake.  This was the policy or custom for how the jail has been running on a regular basis for quite some time.  As a result, the Plaintiff has offered substantial evidence to justify having a jury consider the liability of King County for the constitutional violations complained of in this matter.

7
8

**IV.   KING COUNTY IS RESPONSIBLE FOR PLAINTIFF'S INJURIES UNDER STATE NEGLIGENCE LAW BECAUSE ITS AGENTS VIOLATED THEIR DUTY TO PROTECT PRETRIAL DETAINESS IN ITS CARE.**

9
10
11
12
13
14
15
16

The defendants' final and most desperate argument is that, despite the overwhelming evidence of their failures and the opinions of plaintiff's correctional experts, they are not even liable under Washington state negligence law for the injuries their actions caused Mr. Musse.  Def. Motion at 16-17.  They admit that under state law they had a duty to keep their detainees safe, but they argue that in Washington jailers are presumed to perform their duty, and that presumption is sufficient to overcome all plaintiff's evidence that they did not do so in a reasonable manner.  *Id.* at 17.

17
18
19
20
21
22
23
24
25
26

This is, as our new President might say, malarkey.  The alleged "presumption" defendants cite is nothing more than a archaic formulation of the idea that, in this kind of case like all negligence cases, the plaintiff bears the burden of producing evidence to support his claim.  The Washington Supreme Court made this clear in a decision the defendants themselves cite:  "the presumption that the sheriff has in all things performed his full official duty … being a presumption only, may be rebutted, and when there is evidence tending to rebut that presumption, the question is one of fact for the jury." *Eberhart v. Murphy*, 113 Wash. 449, 452–53, 194 P. 415 (1920); *accord, Winston v. State*, 130 Wash. App. 61, 64, 121 P.3d 1201 (2005).

27

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794

1
2
3
4
5
6
7
8
9
10
11
12
13
14

As detailed above, plaintiff has presented expert, documentary and testimonial evidence which more than "tends" to rebut any presumption the defendants acted with due care. Defendants try to argue otherwise, saying "there is no evidence that DAJD officials had any reason to believe that Anderson would attack Musse" (Def. SJ Mot. at 17)—but again, that simply is not true.  Plaintiff's evidence shows that Mr. Dares, the doctors at Harborview, and the other inmates in the cell where he was placed, all recognized and reported obvious signs that Anderson was dangerously mentally ill.  When asked, Anderson himself admitted he had been on a days'-long "meth fueled rampage," and he had the injuries to prove it.   The Jail's own mental health records contained both a psychiatric diagnosis and a record of that he experienced voices commanding him to attack people—but they were put away, in storage.  The Jail's computerized custody records showed [what???], but they were inaccessible to the officers who made his housing assignment because the computer system was undergoing an upgrade.

15
16
17
18
19
20
21

A jury could easily find from all this evidence that King County and its agents had ample reason to believe that Anderson posed an unreasonable danger to other inmates—but they ignored it all, and the Jail's systems and practices allowed and even encouraged them to do so. Under the state law of respondeat superior, the County's answerable for all aspects of that failure, by all of its agents.  *See Grove v. PeaceHealth St. Joseph Hosp.,* 182 Wash. 2d 136, 148, 341 P.3d 261 (2014).

22

## CONCLUSION

23

The defendants' motion for summary judgment should be denied.

24

DATED this  16th  day of February, 2021.

25

JAY H. KRULEWITCH, ATTORNEY AT LAW

26

By  s/Jay H. Krulewitch

27

Jay H. Krulewitch, WSBA #17612

PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT - 24

10633.1 hd101401

1

2

## <u>CERTIFICATE OF SERVICE</u>

3  I HEREBY CERTIFY that a true and correct copy of the foregoing was served via email on this 16th day of February, 2020 to:

4

5                             Jerry Taylor
                     Senior Deputy Prosecuting Attorney
6            900 King County Administration Building-Civil Division
                     500 Fourth Avenue, Suite 900
7                        Seattle, WA  98104

8  I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct.

9

10           DATED this 16th day of February, 2020.

11

12                             s/*Jay H. Krulewitch*
                     Attorney for Plaintiff Abdiwali Musse

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Jay H. Krulewitch, Attorney at Law
2611 N.E. 113th St, Ste 300
Seattle, Washington 98125
Tel. 206 233-0828
Fax 206 628-0794